## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **MARTIN FORSYTH,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:17-cv-00854-RDP** |
| | } | |
| **UNIVERSITY OF ALABAMA BOARD** | } | |
| **OF TRUSTEES, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant University of Alabama Board of Trustees'[1]

Motion for Summary Judgment. (Doc. # 69). The Board seeks judgment as a matter of law on

Plaintiff Martin Forsyth's two remaining claims under Section 504 of the Rehabilitation Act.[2]

(*Id.*). The Motion (Doc. # 69) has been fully briefed (*see* Docs. # 70, 77, 78) and is ripe for

review. After careful review, and for the reasons explained below, Defendant's Motion (Doc. #

69) is due to be granted.

## I.      Background[3]

In October 2005, Plaintiff began his employment with Defendant as a Carpenter II. (Doc.

---

[1] The University of Alabama is sometimes referred to as "UA" or "the University." The Board of Trustees is sometimes referred to as "the Board."

[2] On February 23, 2018, the court granted in part Defendant's First Motion to Dismiss, dismissing all of Plaintiff's claims except those arising under the Rehabilitation Act. (Doc. # 31). Since that time, Plaintiff has been given two opportunities to amend his claims under the Rehabilitation Act. (Docs. # 34, 45).

[3] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

# 71-3 at 43).[4] In that position, Plaintiff remodeled offices and installed metal stud framing, acoustic ceilings, and sheetrock. (Doc. # 71-3 at 50). A Carpenter II is not a leadership role. (Doc. # 71-20 at 1). At that time of his employment, Plaintiff's direct supervisor was Michal Hubbard, the Assistant Manager for Carpenters and the Cabinet Shop. (Doc. # 71-3 at 43; Doc. # 71-9 at 25).

Every year, UA employees received an Annual Employee Performance Evaluation from their supervisors. In these evaluations, supervisors rate employees based on certain factors, including job knowledge, quality of work, quantity of work, cooperation, and attendance. (Doc. # 73-1 at 184). While working as a Carpenter II, from 2005 until 2008, Plaintiff "met expectations" in all areas of the performance evaluation. (Doc. # 71-3 at 48, 183-87). In 2007, Hubbard remarked that Plaintiff "works well with his co-workers . . . [and] has leadership qualities but[] is able to follow the lead man on their crew very well." (Doc. # 71-3 at 185).

In January 2009, Neal DiChiara was hired as the Manager of Building Maintenance. (Doc. # 71-17 at 39).

In April 2009, Plaintiff was promoted to a Carpenter III. (Doc. # 71-3 at 50-51; Doc. # 76-5 at 5). Defendant considers a Carpenter III to be a supervisory role. (Doc. # 71-20 at 1, ¶ 2). In that position, Plaintiff's evaluation form also rated him based on certain supervisory factors. (Doc. # 71-3 at 52). These factors included: (1) leadership; (2) delegation; (3) planning and organizing; (4) administration; and (5) personal management. (Doc. # 71-3 at 54; Doc. # 71-16 at 1, ¶ 2). Plaintiff "met expectations" in all areas of the June 1, 2008 to May 31, 2009 performance evaluation. (Doc. # 71-3 at 188). Hubbard even commented that Plaintiff "has been in a III position for about six months and has proven that we made the best choice. His planning,

---

[4] The court's citation to deposition testimony corresponds to the actual deposition page number. When citing to other documents, the court cites to the court-filed page number.

leadership[,] and delegation has been good." (Doc. # 71-3 at 188). With respect his supervisory duties, Plaintiff "met expectations" in the areas of leadership, delegation, and planning and organizing. (Doc. # 71-3 at 53-54; Doc. # 71-4 at 2). However, there was nothing marked in the areas of administration and personal management. (Doc. # 71-3 at 53-54; Doc. # 71-4 at 2).

In May 2009, Clint Hamner was hired as the Associate Manager of Building Maintenance. (Doc. # 71-16 at 2). Hamner reported to DiChiara, and DiChiara in turn reported to Duane Lamb, the Associate Vice President for Facilities and Grounds. (Doc. # 71-23 at 7-8). Thus, in 2009, the relevant chain of command was:

Plaintiff—>Hubbard—>Hamner—>DiChiara—>Lamb.

(Doc. # 71-3 at 43; Doc. # 71-9 at 19).

Plaintiff "met expectations" in all areas of the June 1, 2009 to May 31, 2010 performance evaluation. (Doc. # 71-4 at 3). Hamner commented that Plaintiff "is a natural leader and the one that people look to." (Doc. # 71-4 at 4). With respect to his supervisory duties, Plaintiff "met expectations" in the areas of leadership, delegation, and planning and organizing, but there was nothing marked on administration and personal management. (Doc. # 71-4 at 5).

## 1.    Plaintiff's 2010 Corrective Counseling for Leaving His Work Station Without Authorization

On September 2, 2010, Plaintiff was working in the University's South Lawn Building. (Doc. # 71-3 at 24). Contemporaneously, the University's environmental team was abating asbestos in that building. (Doc. # 71-3 at 24). Plaintiff believed the team was not following proper protocol because the team was abating asbestos while Plaintiff and others were working "side by side with them." (Doc. # 71-3 at 24-25). Because he felt unsafe, Plaintiff stopped working and went to notify the University's Environmental Health and Safety Department ("EHS") of the activity. (Doc. # 71-3 at 26). Plaintiff did not inform anyone he was leaving his

work area to go speak with EHS. (Doc. # 71-3 at 26). Plaintiff testified that with any asbestos-related situation, employees were told to notify EHS. (Doc. # 71-3 at 26-27). Because Plaintiff left his work area without first communicating with Hubbard, Hamner, or DiChiara, he was issued a "corrective counseling."[5] (Doc. # 71-16 at 1, ¶ 3; Doc. # 71-20 at 1, ¶ 3; Doc. # 71-4 at 10). Todd Copeland, a Human Resources Business Partner for the University, testified that DiChiara wanted to issue Plaintiff the corrective counseling because DiChiara felt like Plaintiff was trying to set him (DiChiara) up by going straight to EHS instead of him, and that made the department look bad. (Doc. # 71-26 at 92; Doc. # 71-29 at 1, ¶ 1).

Plaintiff disputed the issuance of a corrective counseling and did not sign the form. (Doc. # 71-3 at 174-75; Doc. # 71-7 at 9). (Doc. # 71-3 at 176). He testified that after this incident DiChiara began harassing him. (Doc. # 71-3 at 24).

Plaintiff "met expectations" in all areas of the June 1, 2010 to May 31, 2011 performance evaluation. (Doc. # 71-4 at 7). One of Plaintiff's supervisors commented that "Plaintiff is productive at completing tasks as assigned. His knowledge [and] skill in his trade have always been a strength. . . . [But he] can improve his attitude [and] outlook towards his job . . . ." (Doc. # 71-4 at 8). This was the first time Plaintiff received a comment about his attitude on any performance evaluation.

## 2.    Plaintiff's 2011 Three-Day Suspension

On May 25, 2011, DiChiara received an email notifying him (and each UA department) that there would be a mandatory Ethics Law Training meeting on June 29, 2011 from 2:30 p.m. to 3:30 p.m. (Doc. # 71-10 at 115). It was not until June 29, 2011 at 10:20 a.m. when Hubbard

---

[5] Under Defendant's policy, employees who discover asbestos-containing materials are to cease operations to allow "EHS or abatement personnel to determine the appropriate response." (Doc. # 71-17 at 91). Nowhere in the policy does it say for an employee to first notify his or her supervisor. (Doc. # 71-17 at 149). However, DiChiara testified that it was "common practice for University employees to report any problems or issues to their supervisor before contacting EHS." (Doc. # 17-17 at 90; Doc. # 71-20 at 2, ¶ 4).

notified all staff, including Plaintiff, of this mandatory meeting. (Doc. # 71-10 at 112, 121). Plaintiff's shift was scheduled to end at 2:30 p.m. (Doc. # 71-10 at 112). He could not attend the meeting because he had an unspecified "personal" appointment after his shift ended, and he needed to go home because he and his family were leaving for a vacation the next morning. (Doc. # 71-10 at 112). Plaintiff asked Hubbard for permission to miss the meeting, and Hubbard gave it to him. (Doc. # 71-10 at 112). Between 11:00 a.m. and 11:20 a.m., Plaintiff also asked DiChiara if he could miss the meeting and whether there would be any consequences if he did miss it. (Doc. # 71-10 at 112; Doc. # 71-20 at 2, ¶ 5). DiChiara responded "I don't know." (Doc. # 71-10 at 112). DiChiara then told Plaintiff that it would be his decision whether to miss the meeting. (Doc. # 71-12 at 28). Plaintiff asked DiChiara if he was "threatening his job." (Doc. # 71-19 at 59). Frustrated with Plaintiff's "multiple questions," DiChiara "took that as being disrespectful" and responded by using profanity. (Doc. # 71-20 at 2, ¶ 6; Doc. # 71-17 at 374). Also, as a result, on June 29, 2011, Plaintiff was issued a corrective counseling for insubordination and he was suspended for three-and-a-half days without pay. (Doc. # 71-10 at 110). DiChiara noted that Plaintiff was "argumentative, disrespectful, and insubordinate" when asking about missing the mandatory ethics meeting. (Doc. # 71-10 at 110). DiChiara also told Copeland that he wanted to fire Plaintiff "for arguing with him in front of a bunch of people." (Doc. # 71-28 at 104). Although Plaintiff signed this corrective counseling, he disputed it. (Doc. # 71-3 at 26; Doc. # 76-3 at 26).

In 2012, A.J. Johnston was hired as the Project Manager for Building Management. (Doc. # 71-33 at 8). Johnston replaced Hubbard as Plaintiff's direct supervisor. (Doc. # 71-3 at 47; Doc. # 71-33 at 8). From June 1, 2011 to May 31, 2012, Plaintiff "met expectations" in all areas of his performance evaluation, except "cooperation," which was marked as "needs

improvement." (Doc. # 71-5 at 135). Johnston testified that he initially marked "cooperation" as "meets expectations" because he was unaware of the June 29, 2011 encounter between Plaintiff and DiChiara. (Doc. # 71-33 at 24). However, upon DiChiara's review of Plaintiff's performance evaluation, DiChiara informed Johnston of the June 29, 2011 encounter and told Johnston that it needed to be reflected on the performance evaluation. (Doc. # 71-33 at 24). Nevertheless, on the performance evaluation, DiChiara commented that "[s]ince his suspension, [Plaintiff] has improved his standing in the department by doing everything that was asked of him. . . . [H]e has a positive relationship with his new supervisor and therefore I expect that [Plaintiff's] impact on the department will add value to the University." (Doc. # 71-5 at 136). Plaintiff also "met expectations" for all supervisory factors. (Doc. # 71-5 at 137).

### 3.   Plaintiff's 2013 Performance Improvement Plan

Plaintiff "met expectations" in all areas of his June 1, 2012 to May 31, 2013 performance evaluation with one exception: "job knowledge," where Johnston marked that Plaintiff "exceeded expectations." (Doc. # 71-5 at 139). Plaintiff also "met expectations" for all supervisory factors. (Doc. # 71-5 at 140).

On July 1, 2013, Plaintiff was involved in an incident between himself and a co-worker, Samantha Caddis. (Doc. # 71-19 at 60). Plaintiff was talking to another co-worker, Ben Hamner, about Caddis, and Plaintiff allegedly said that Caddis "don't know nothing, and she will straight up lie to your face." (Doc. # 71-19 at 60). Chaddis overheard the remark, became upset, and left work. (Doc. # 71-19 at 60). DiChiara became aware of this and looked into the matter, but he could not "decipher the 'he said she said,'" so he consulted with Human Resources. (Doc. # 71-19 at 60). The Rule 56 record is unclear as to what, if anything, resulted from this situation.

6

On July 12, 2013, DiChiara issued Plaintiff a Performance Improvement Plan ("PIP"). (Doc. # 71-3 at 35; Doc. # 76-3 at 30). DiChiara issued this PIP because "[t]here [were] seven documented occasions . . . [where Plaintiff's] attitude and/or working relationship with management and coworkers . . . need[ed] improvement" since July 31, 2010. (Doc. # 76-3 at 30). Based on the recommendation of Human Resource Manager Mary Nye (Doc. # 71-30 at 135-36), the PIP was "built on five University competencies," which were accompanied by "specific actions/measurables needed for improvement to an acceptable level of job performance." (Doc. # 76-3 at 30; Doc. # 76-10 at 13-16). "The goal of the PIP was to increase [Plaintiff's] productivity as a lead carpenter and increase his rapport with [his] co-workers."[6] (Doc. # 71-20 at 2, ¶ 7). The PIP also provided for "[a] formal follow-up with [Plaintiff's] supervisors [to] occur every 30 days beginning on or about August 7, 2013[7] to discuss [his] progress, what improvements have been made, and any continuing concerns."[8] (Doc. # 76-3 at 33).

On July 25, 2013, Plaintiff disputed the PIP in writing. (Doc. # 71-4 at 60). Previously, on July 12, 2013, Plaintiff was called into a conference room with DiChiara, Hamner, and Johnston. (Doc. # 71-4 at 60). He alleges that he was given two options: to follow the PIP or "seek employment elsewhere." (Doc. # 71-4 at 60). Plaintiff also remarked that DiChiara told him that he "would be dealt with 'harshly' if [he] told anyone about the meeting and what was

---

[6] For example, one of the "action items" in the PIP encouraged Plaintiff to use the Building Maintenance time clock as opposed to the elevator shop time clock to help "increase interaction with coworkers." (Doc. # 71-4 at 52).

[7] During the first meeting on August 7, 2013, Hamner made notes for himself and DiChiara regarding the discussions that occurred during the meeting. (Doc. # 76-6 at 28). Hamner noted that Plaintiff "admitted that he had an abrasive personality." (Doc. # 76-6 at 28). Also during this meeting, Plaintiff told his supervisors (Johnston, Hamner, and DiChiara) that he was afraid of being fired and that he "felt the [PIP] . . . was a 'wind up for the pitch to be fired.'" (Doc. # 76-6 at 30).

[8] DiChiara's initial draft of the PIP included the requirement that Plaintiff read the book, "How to Make People Like You in 90 Seconds," by Nicholas Boothman. (Doc. # 71-26 at 104; Doc. # 71-28 at 152-53). However, this section of the PIP was removed on September 11, 2013 (after Plaintiff had been issued the PIP), and Plaintiff never read the book. (Doc. # 71-3 at 184; Doc. # 71-26 at 125; Doc. # 76-6 at 37).

said." (Doc. # 71-4 at 62).

In August 2013, Plaintiff filed an internal complaint alleging harassment with the then-EEO Officer for the University, Dr. Gwen Hood. (Doc. # 71-24 at 22; Doc. # 71-19 at 3, ¶ 9). Plaintiff primarily complained about DiChiara placing him on the PIP. (Doc. # 71-29 at 13). Hood investigated the complaint and met with Paul Wuebold (the Senior Executive Director for Facilities and Grounds) and Lamb. (Doc. # 71-29 at 24; Doc. # 71-26 at 14). Hood agreed that the PIP was warranted but informed Wuebold and Lamb that the UA Competencies Initiative (incorporating the "core competencies") had not been rolled out with employee training yet, so the PIP could not include the "core competencies *as measurables*."[9] (Doc. # 71-29 at 24) (emphasis added). Thus, a revised PIP was issued to Plaintiff on October 24, 2013. (Doc. # 71-20 at 2, ¶ 7; Doc. # 76-3 at 35). The revised PIP kept in place the underlying information in the core competencies, such as the "essential workplace behavior/actions." (Doc. # 71-29 at 24). The revised PIP merely labeled the behavior/actions as "traits" as opposed to "competencies." (Doc. # 76-3 at 30-38). Plaintiff successfully completed the PIP in January 2014. (Doc. # 71-20 at 2, ¶ 9).

### 4.     Plaintiff's September 2013 Corrective Counseling

On September 20, 2013, Plaintiff overheard a conversation between coworkers about

---

[9] Copeland testified that, although the core competencies had not yet been rolled out with the employee training, the University was campaigning at that time to have these competencies undergird a strategic plan for improving workplace conduct. (Doc. # 71-28 at 139). Copeland testified that "the campaign never got off the ground like it was planned," but that, at the time Plaintiff was issued the PIP in 2013, the belief was that University eventually would publish the competencies and incorporate them into all employee training. (Doc. # 71-28 at 139). Therefore, they used the core competencies in the PIP based on the assumption that all employees would be trained about them. (Doc. # 71-28 at 139-40). Specifically, Copeland testified:

> Right. But they're basic things. That's why when we did the staff dispute, and that was one of the things we changed, we left the basic information in there and just took out the words core competencies cause – I mean, adaptability is adaptability. So I mean, so that's why we felt comfortable using it.

(Doc. # 71-28 at 140).

compensation and made this comment: "You haven't learned yet that the University is going to do what benefits the University." (Doc. # 71-4 at 144). Although Plaintiff stated he said it "in a kidding kind of way," on September 26, 2013, he was issued a corrective counseling. (Doc. # 71-10 at 131; Doc. # 76-13 at 7). It was this corrective counseling that prompted the revision to the PIP. (Doc. # 71-20 at 2, ¶ 7).

On October 8, 2013, Plaintiff disputed this corrective counseling. (Doc. # 76-13 at 6). "This entire [corrective counseling] is yet another attempt at retaliation made by . . . DiChiara against me . . . . I have been saying . . . that … DiChiara was going to retaliate against me and I was worried . . . what he might do." (Doc. # 76-13 at 6, 8).

In October 2013, Lamb met with Plaintiff about his dispute. Because "Plaintiff seemed angry and frustrated," Lamb suggested to Plaintiff that he talk with the University's Employee Assistance Program ("EAP") "about counseling, anger management, depression, or a whole array of thing that could help him be more successful." (Doc. # 71-25 at 3, ¶ 5).

On Plaintiff's next performance evaluation, from June 1, 2013 to May 31, 2014, he "met expectations" in both "job knowledge" and "quality of work," and he "exceeded expectations" in "quantity of work" for that period. (Doc. # 71-5 at 141).

In 2014, David Marlowe became the Assistant Manager of Building Maintenance and replaced Johnston as Plaintiff's direct supervisor. (Doc. # 71-21 at 11, 71-72).

On July 17, 2014, Plaintiff met with Hamner and DiChiara to "discuss [Plaintiff's] new work assignment" and shift. (Doc. # 76-13 at 16). Plaintiff's "route" was changed to include the Alabama Adult Psychiatric Building (the "Bryce" Building)—an assignment he volunteered for. (Doc. # 76-13 at 16; Doc. # 71-10 at 140). In this meeting, DiChiara acknowledged Plaintiff's "improved disposition around the shop." (Doc. # 76-13 at 16). DiChiara "complimented

[Plaintiff] on his attitude and told him how much he [DiChiara] appreciated the way [Plaintiff] was handling himself around the shop." (Doc. # 71-13 at 16). This meeting also marked the end of the monthly management meetings with Plaintiff to discuss his prior disciplinary issues. (Doc. # 71-13 at 16).

On July 24, 2014, because of his "hard work, dedication[,] and contribution . . . to the success of [the] University and the Facilities and Grounds Department," Plaintiff received a raise, which became effective August 16, 2014. (Doc. # 76-13 at 32). Lamb signed and issued this raise. (Doc. # 76-13 at 32).

### 5.    Plaintiff's March 2015 Final Corrective Counseling

On March 12, 2015, DiChiara met with Hamner, Marlowe, and Plaintiff. (Doc. # 71-10 at 133). Plaintiff was issued a "final" corrective counseling regarding a number of incidents that had occurred between January and March 2015. (*Id.*). That final counseling addressed the following events:

> 1.  On 1-6-15, [Marlowe] question[ed] [Plaintiff] about a work order that involve[d] hanging plaques at Martha Parham West. There is a total of 6 hours of time placed on this work order because [Plaintiff] worked with Tyrone Cameron to complete.
>
> 2.  On 2-4-15, when asked about the status of a project that he and Danny Ramsey are working on, Plaintiff [told] [Marlowe] that he "doesn't know what is going [on] with Danny Ramsey," "he's not trying [to] get Danny in any trouble." [Plaintiff] then [told Marlowe] to "get with John Reed and he can tell [Marlowe] what [was] going on with Danny Ramsey."
>
> 3.  Week of 2-16-15, [Marlowe] stop[ped] by the Presidential Shop. [Plaintiff] ask[ed] [Marlowe] "why are you coming by here all the time." [Plaintiff] also ask[ed] what the deal [was] with Burton and Butch. When told that Burton would be receiving Butch's buildings, [Plaintiff told Marlowe] that "yall are supposed to check with me anytime something changes to see if I want to stay at Bryce."

4. Week of 2-16-15, [Plaintiff] ask[ed] John Reed what the deal [was] with Bryce Escort Policy. [Plaintiff] ma[de] the comment that "his supervisors won't tell him."

5. Week of 2-16-15, [a] student office worker call[ed] [Plaintiff] on the office radio to notify him of a work order to repair a door. [Plaintiff] ask[ed] the student if it's a priority and [told] the student that he is tied up and would he mind calling someone else. [DiChiara] overhear[d] the conversation and direct[ed] the student to tell [Plaintiff] to please check on this before he [left for the day]. [Plaintiff] ask[ed] [Marlowe] "what is the role of the office personnel. Had they been instructed to give orders to employees?"

6. Week of 2-16-15, [Hamner] notifie[d] [Plaintiff] that [they were] staffing through spring break. [Plaintiff] sa[id] that he will do what is asked but that "he wanted off the Bryce Route if this was the way holidays were going to go." [Plaintiff] also stated that he wanted "one of his people" here if he had to work to accompany him. [Hamner] explained that other shops would have staff here. [Plaintiff] asked if the other shop persons would "be at beckoned call." [Hamner] explained that it didn't really work that way.

(Doc. # 71-10 at 134). The final counseling also noted that:

> Although [Plaintiff] has shown some improvement since being put on a performance improvement plan, there are signs that he is reverting back to the same behavior that resulted in him being put on that plan . . . . His behavior is not acceptable for the lead worker of a technician group. His behavior shows a pattern of failure [to] take on reasonable assignments in a professional and/or respectful manner.

(Doc. # 71-10 at 133).

DiChiara has explained that he issued this final counseling due to Plaintiff's "performance issues" and his "behavior/conduct infraction[s]." (Doc. # 71-10 at 133). In this final counseling form, DiChiara noted that Plaintiff "place[d] demands on supervisors" and "question[ed] the actions of his supervisor and [gave] [] order[s] on departmental operations." (Doc. # 71-10 at 134). Wuebold testified that "[t]he final warning was given not as a result of any single infraction, but rather [because] each instance represented a relapse and continuation of

11

the poor behavior that the PIP was intended to address." (Doc. # 71-27 at 2, ¶ 4). The final counseling form set a follow-up date of April 20, 2015, and it also noted that if Plaintiff did not show improvement, "[d]ismissal [would] [b]e [r]ecommended." (Doc. # 71-10 at 133-34).

Plaintiff refused to sign the final counseling form, and on March 20, 2015, he disputed it. (Doc. # 71-10 at 135-36). Plaintiff asserted that the events listed were misconstrued and taken out of context. He also complained that during the discipline meeting, he was "repeatedly interrupted, laughed at, and ignored." (Doc. # 71-10 at 136, 138). Plaintiff requested that a Human Resource Representative, Todd Copeland or Gwen Hood, be present for the meeting, but that request was also "ignored." (Doc. # 71-10 at 136). Plaintiff complained that DiChiara merely took "snippets of work related and non work related conversations and interactions, the majority of which he had no part in, and twisted them and [wrote] them in a way that would aide in his attempts to have me constructively dismissed/discharged." (Doc. # 71-10 at 140). Plaintiff also complained in his dispute that "[t]his personal battle [that DiChiara] has waged against me has been going on since 9-21-10, according to my extensive, detailed documentation." (Doc. # 76-13 at 44). Plaintiff's dispute was not reviewed, as it "did not reveal an allegation that a policy, procedure, or practice of the University [had] been misapplied." (Doc. # 76-13 at 33).

On April 15, 2015, Plaintiff submitted a revised dispute statement regarding the final counseling. (Doc. # 76-13 at 39). On April 23, 2015, the revised dispute was also deemed "not reviewable." (Doc. # 76-13 at 34).

### 7.    Plaintiff Seeks Counseling

On March 12, 2015, Plaintiff sought counseling from Vanessa Graves at the EAP because he "had a lot of anxiety[] and . . . depression." (Doc. # 71-3 at 87-88, 99; Doc. # 79-1). Plaintiff

testified that the only reason he sought counseling was due to his frustrations with work.[10] (Doc. # 71-3 at 100). Specifically, Plaintiff testified that, although his depression did not affect the physical aspect of his job, it did affect his interactions with others and his viewpoint towards his job. (Doc. # 71-3 at 104-05). Further, Plaintiff testified that his depression interfered with his interactions with others because he "didn't want to talk to people;" he "wanted to do [his] job and go home." (Doc. # 71-3 at 104-05). He also testified that his anxiety made him "scared to talk" to anyone or engage with his supervisors "in any way." (Doc. # 71-3 at 257). And, he testified that he frequently experienced headaches, had trouble with his memory, slept frequently, and stopped running for pleasure. (Doc. # 71-3 at 258-60).

According to his sealed counseling records, Plaintiff's "primary presenting problem" was "marital," and the "secondary presenting problem" was depression. (Doc. # 79-1 at 3). Plaintiff also reported problems with "other job concerns," "stress," and "depression." (Doc. # 79-1 at 3). On April 2, 2015, at a second counseling session, Graves first noted that Plaintiff was experiencing anxiety attacks. (Doc. # 79-1 at 5). On April 23, 2015, Graves continued to help Plaintiff find ways to "manage his anxiety" because he reported that he was not sleeping well. (Doc. # 79-1 at 5). On May 28, 2015, Plaintiff told Graves that, since his last session, "nothing had changed," but that he thought it was because his supervisors knew he was going to counseling. (Doc. # 79-1 at 5). Graves reassured Plaintiff that "no one knew unless he told them." (Doc. # 79-1 at 5). Graves explained the EAP's confidentiality, and Plaintiff "was pleased" to hear that. (Doc. # 79-1 at 5).

Plaintiff testified that, after he had already started going to counseling, he informed Marlowe and a few coworkers that he had sought help at the EAP. (Doc. # 71-3 at 90-91).

---

[10] Plaintiff testified that, although he did not receive a diagnosis of depression or anxiety until 2015 (after his employment ended), beginning in 2013 he "knew something was wrong with [him]." (Doc. # 71-3 at 267).

Plaintiff testified that Marlowe inquired as to why Plaintiff was filling out a slip to take leave, so Plaintiff told him that he was going to the EAP for his depression.[11] (Doc. # 71-3 at 91-92). Plaintiff does not know if Graves ever diagnosed him with depression. (Doc. # 71-3 at 93). Plaintiff did not inform any other supervisor that he was receiving counseling for depression and anxiety, and no manager ever made any comments about Plaintiff seeking counseling. (Doc. # 71-3 at 91-92). Neither Marlowe, Hamner, nor DiChiara had ever been "trained to identify depression, anxiety, or any other mental [health] condition," and they were all unaware that Plaintiff's behaviors may have been related to depression or anxiety. (Doc. # 71-16 at 3, ¶ 9; Doc. # 71-20 at 4, ¶ 17; Doc. # 71-22 at 1, ¶ 3).

On Plaintiff's next performance evaluation, covering May 1, 2014 to April 30, 2015, he was rated as "needs improvement" in "job performance" and "quality of work," but he "met expectations" in "quantity of work." (Doc. # 71-5 at 143-44). Plaintiff was marked "unacceptable" for "cooperation," but "acceptable" for "attendance." (Doc. # 71-5 at 144). Under "cooperation," there were comments that Plaintiff was "sometimes rigid and defensive" and that he did "not foster [a] good working environment." (Doc. # 71-5 at 144). It was also noted that Plaintiff "needed improvement" in all supervisory factors. (Doc. # 71-5 at 145). DiChiara commented: "[Plaintiff] has been given specific instructions on what is required of his job performance. If those requirements are not met, termination will be recommended." (Doc. # 71-5 at 145).

### 8.    Plaintiff's Termination

Every year, from May to August, the Facilities and Grounds team performs a "summer

---

[11] Marlowe testified that he does not recall Plaintiff reporting to him that he (Plaintiff) was seeking counseling at the EAP. (Doc. # 71-21 at 264; Doc. # 71-22 at 2, ¶ 4). Marlowe also testified that he did not complete any form for Plaintiff to go to the EAP (Doc. # 71-21 at 264; Doc. # 71-22 at 2, ¶ 4), and that Plaintiff did not confide in him in 2015 about his (Plaintiff's) depression and anxiety. (Doc. # 71-21 at 273).

walk-through." (Doc. # 71-21 at 180). The "priority" in the summer is to turn all the dorms over to get them ready for students to return in the fall. (Doc. # 71-21 at 180). During these walk-throughs, managers are given work orders, which are "blanket . . . for every dormitory," and everybody is expected to communicate and work together to get the work orders completed. (Doc. # 71-21 at 181-83). Employees are not generally given a specific dormitory to work in; if there are jobs to be done at any dormitory, UA employees are expected to assist as necessary. (Doc. # 71-21 at 183-84).

In May and June 2015, Plaintiff worked at the Lakeside dormitory with Tyrone Cameron. (Doc. # 71-21 at 189). Specifically, while working at Lakeside, Plaintiff billed time on May 28, 2015, June 4, 2015, June 9, 2015, June 15, 2019, June 22, 2015, and June 29, 2015.[12] (Doc. # 71-16 at 2, ¶ 8).

In July 2015, Allison Wade, the former Logistics Coordinator of Housing and Residential Communities, conducted an inventory of storage rooms in all the dormitories on campus. (Doc. # 71-34 at 1, ¶ 2). Hamner, DiChiara, and Wuebold were unaware that this inventory was taking place. (Doc. # 71-16 at 2, ¶ 6; Doc. # 71-20 at 2, ¶ 10; Doc. # 71-27 at 2, ¶ 5). On July 15, 2015, Wade discovered a room on the third floor of the Lakeside dormitory that was locked. (Doc. # 71-34 at 2, ¶ 4). Wade and others did not have a key for it, and the locksmith could not open it.[13] (Doc. # 71-34 at 2, ¶ 4). Wade called Tyrone Cameron, the Building Tech at Lakeside, to open the door; however, Cameron was unavailable, so Tim Bolden, who also had a key, was called to unlock the door to the room. (Doc. # 71-34 at 2, ¶ 4). After the door was opened, Wade

---

[12] Around this same time, on June 1, June 15, June 22, June 29, and July 13, Plaintiff signed up to work overtime. (Doc. # 71-12 at 119-26).

[13] During the inventory, Wade found only one other room that the locksmith could not open. It was in Riverside West dormitory, and it had the same lock as the storage room in the Lakeside dormitory. (Doc. # 71-34 at 2, ¶ 7).

discovered that the room had been converted into a "breakroom" and was equipped with a refrigerator, a microwave, chairs, a table, groceries, newspapers, shelves, and carpet on the floor. (Doc. # 71-34 at 2, ¶ 5; Doc. # 76-8 at 10). Although Cameron characterized the room as a storage room for tools, there were only "a couple of tools and [there was] minimal storage." (Doc. # 71-21 at 185; Doc. # 71-34 at 2, ¶ 5).

After this discovery, DiChiara reviewed the video surveillance footage from that area. (Doc. # 71-16 at 2, ¶ 7; Doc. # 71-20 at 3, ¶ 11). The video footage showed that Plaintiff, Danny Ramsey, and Tyrone Cameron had frequently used the room during the summer walk-through while working at the Lakeside dormitory. (Doc. # 71-16 at 2, ¶ 7). DiChiara "created a spreadsheet documenting each time an employee was seen entering the room or taking what appeared to be an unauthorized break."[14] (Doc. # 71-20 at 3, ¶ 11). Plaintiff was observed "not working for 85 minutes during the seven day period." (Doc. # 71-28 at 212; Doc. # 71-9 at 149-50).

On July 17, 2015, after learning about the storage room, Lamb emailed Wuebold that this event "should serve as [Plaintiff's] termination." (Doc. # 71-9 at 147). Lamb testified that Plaintiff was terminated because he had already been given a final warning. (Doc. # 71-23 at 89). Lamb stated in the email that, "as for the others[,] . . . I'll wait and see the video and hear their story." (Doc. # 71-9 at 147).

On July 20, 2015, DiChiara and Hamner met individually with Plaintiff, Ramsey, Cameron, and Bolden and asked each of them if they had a key to the "makeshift breakroom" and whether they had taken unauthorized breaks. (Doc. # 71-20 at 3, ¶ 12). Plaintiff initially denied knowing where the lock came from; however, he had a key and had previously installed

---

[14] Employees under "Building Maintenance" are provided two paid break periods per shift: 9:00 a.m. – 9:15 a.m. and 2:00 p.m. – 2:15 p.m. (Doc. # 76-8 at 12). Taking an unauthorized break is a violation of the Department's break policy and does not meet the University's Standards of Behavior. (Doc. # 76-8 at 12).

the new lock on the door. (Doc. # 71-3 at 122; Doc. # 71-20 at 3, ¶ 12; Doc. # 71-21 at 186). All four employees denied taking unauthorized breaks. (Doc. # 71-20 at 3, ¶ 12). Plaintiff, specifically, testified that he never used the room to take an unauthorized break. (Doc. # 71-3 at 120-2). When presented with video evidence, he claimed that the alleged unauthorized breaks were actually times when he was either making work-related phone calls or was waiting on plumbers, electricians, or other workers to complete their tasks before he could complete his work orders. (Doc. # 71-3 at 124-25; Doc. # 76-19 at 1, ¶ 4). Plaintiff also testified that he sometimes would sit down to "formulate some kind of plan." (Doc. # 71-3 at 124-25). DiChiara, however, testified that -- even if that were the case -- Plaintiff (along with Ramsey and Cameron) should have "walked through the dorm to identify and fix areas that needed repairs or work on other works orders that they had." (Doc. # 71-20 at 4, ¶ 13).

Plaintiff testified that storage rooms, such as the one found at Lakeside, were "scattered all over campus and [were] utilized by many workers." (Doc. # 71-7 at 97, 103). And, "one of the managers [(Johnston)] had a contractor put shelves in the [Lakeside dormitory] room so [they] could put [any] materials on [them]." (Doc. # 71-7 at 97, 103).

On July 22, 2015, as a result of the Lakeside storage room discovery, the video footage, and the individual interviews, DiChiara[15] and Lamb[16] terminated Plaintiff's employment, effective July 27, 2015. (Doc. # 71-20 at 4, ¶ 14; Doc. # 71-25 at 2, ¶ 8; Doc. # 76-8 at 12-13). DiChiara also terminated Ramsey's and Cameron's employment. (Doc. # 71-20 at 4, ¶ 14). Ramsey was terminated notwithstanding the fact that he only had one verbal counseling in over six years. (Doc. # 71-20 at 4, ¶ 16). Bolden was not terminated because he was not seen in the

---

[15] DiChiara testified that Marlowe did not recommend that Plaintiff's employment be terminated. (Doc. # 71-20 at 5, ¶ 20).

[16] Lamb approved DiChiara's decision to terminate Plaintiff. (Doc. # 71-25 at 2, ¶ 8).

video footage taking any unauthorized breaks or entering the makeshift breakroom; however, he was still issued a written counseling for his involvement. (Doc. # 71-20 at 4, ¶ 14).

After Plaintiff's termination, he began seeing Dr. Iona Shirley for counseling. (Doc. # 71-3 at 93, 150). Dr. Shirley formally diagnosed Plaintiff with depression and prescribed him medication.[17] (Doc. # 71-3 at 93, 241). That was his first such diagnosis. (Doc. # 71-3 at 93).

### 9. Plaintiff's EEOC Charge and the State of Alabama Unemployment Benefits Appeals Hearing

On August 31, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Office ("EEOC"), claiming retaliation, age discrimination, and disability discrimination. (Doc. # 1-1 at 2).

Subsequently, Plaintiff applied for unemployment benefits. (Doc. # 71-7 at 110). An Administrative Hearing Officer ruled that Plaintiff was "disqualified indefinitely for benefits." (Doc. # 71-7 at 86). Plaintiff appealed. (Doc. # 71-7 at 86). During the Appeals hearing, Plaintiff was asked whether he believed "[he] was accused of taking unauthorized breaks because he was [being retaliated against] . . . for having complained [about asbestos in 2010] . . . and not performing his management duties." (Doc. # 76-15 at 39). Plaintiff responded: "[v]ery much so." (Doc. # 76-15 at 39). Plaintiff did not reference his alleged depression or anxiety.

On February 19, 2016, the Board of Appeals issued its decision, reversing the Administrative Hearing Officer's decision disqualifying Plaintiff from unemployment benefits. (Doc. # 71-7 at 110). The Board of Appeals found that Plaintiff was not taking unauthorized breaks. (Doc. # 71-7 at 110).

On May 23, 2017, Plaintiff filed this lawsuit. (Doc. # 1).

---

[17] The court notes that no records were produced from Dr. Shirley. Defendant stated that it attempted to subpoena these records but was informed by the care provider that the records had already been destroyed.

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the

complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

Plaintiff's Second Amended Complaint contains two claims: (1) Count One alleges disparate treatment under the Rehabilitation Act; and (2) Count Two alleges disparate impact under the Rehabilitation Act. (Doc. # 45). Plaintiff claims that Defendant (1) unlawfully

terminated him because of his depression—a disability, and (2) employed an unlawful evaluation and disciplinary system, which had a disparate impact on individuals manifesting symptoms of depression who were otherwise fully capable of performing their jobs. (Doc. # 45 at ¶¶ 71-93). The court addresses each claim, in turn. After careful review, the court concludes that Defendant's Motion for Summary Judgment is due to be granted.

The Rehabilitation Act generally prohibits any program or activity receiving federal funds from discriminating against an otherwise qualified individual with a disability. *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *see* 29 U.S.C. § 794(d). Claims asserted under the Rehabilitation Act that rely upon circumstantial evidence are evaluated in the same manner as those under the Americans with Disabilities Act ("ADA"), including use of the *McDonnell-Douglas*[18] burden-shifting framework. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *Collado v. United States Postal Service Co.*, 419 F.3d 1143, 1149-50 (11th Cir. 2005).

## A. Plaintiff's Disparate Treatment Claim

In order to establish a *prima facie* case under Section 504 of the Rehabilitation Act, a plaintiff must show that: 1) he has a disability; 2) he is a qualified individual; and 3) he was discriminated against (*i.e.*, suffered an adverse employment action) because of the disability. *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130 (11th Cir. 1996). If the plaintiff satisfies all the elements of the *prima facie* case of discrimination, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for [its] employment action[s]." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003). If the defendant can satisfy that light burden, the plaintiff must then "introduce significantly probative evidence showing that the asserted reason is merely pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citations omitted) (addressing the *McDonnell-Douglas* scheme in the context of a

---

[18] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Title VII claim).

Here, it is undisputed that Plaintiff was a qualified individual; therefore, the court addresses the first and third prongs of the *prima facie* test.

### 1.      Plaintiff's Alleged Disability

The Rehabilitation Act defines the term "disability" to include: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also* 29 C.F.R. § 1630.2(g). Plaintiff asserts that Defendant "regard[ed] [him] as" being depressed.[19] (Doc. # 45 at 18, ¶ 65).

The Eleventh Circuit mandates that in order to prevail on a "regarded as" theory under the Rehabilitation Act, a plaintiff must "show that [the employer acted] because it regarded him as having a [mental] impairment as that term is defined by the [Rehabilitation] Act." *Sutton v. Lader*, 185 F.3d 1203, 1208 (11th Cir. 1999) (emphasis omitted); *see Carter v. Lurleen B. Wallace Junior Coll.*, 173 F. Supp. 2d 1204, 1210 (M.D. Ala. 2001). Since the enactment of the ADA Amendments Act of 2008 ("ADAAA"), "a 'regarded as' claim . . . is much easier to prove than a 'regarded as' claim before the ADAAA." *Cooper v. CLP Corp.*, 2015 WL 9311964, *4 (N.D. Ala. Dec. 23, 2015). "[T]he 'regarded as' disabled prong no longer requires a showing that the employer perceived the individual to be substantially limited in a major life activity."[20] *Id.*

Under the Rehabilitation Act, "[d]epression . . . constitute[s] a mental impairment." *Pritchard*, 92 F.3d at 1132 (citing *Doe v. Region 13 Mental Health–Mental Retardation*

---

[19] While Plaintiff primarily focuses on his depression, he also testified that he suffered from anxiety. (Doc. # 71-3 at 99).

[20] The statutory language makes this point clear. An ADA plaintiff must show that "he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added).

*Commission*, 704 F.2d 1402, 1408 (5th Cir. 1983)). However, "[m]erely having a mental impairment does not mean that [Plaintiff] is disabled"[21] under the "regarded as" prong. *See Rogers v. CH2M Hill, Inc.*, 18 F. Supp. 2d 1328, 1342 n.2 (M.D. Ala. 1998). Plaintiff must also show that Defendant knew that, or perceived that, he suffered from a mental impairment.

Although Plaintiff was never diagnosed with depression during his employment with Defendant, he contends that condition affected his interactions with others because he "didn't want to talk to people;" he "wanted to do [his] job and go home." (Doc. # 71-3 at 104-05). He also testified that his anxiety made him "scared to talk" to anyone or engage with his supervisors "in any way." (Doc. # 71-3 at 257). He also claims that he experienced headaches, had trouble with his memory, was constantly tired, and stopped running for pleasure. (Doc. # 71-3 at 258-60). Since his termination, Plaintiff testified that he "sometimes" experiences symptoms of depression, such as "general feelings of sadness." (Doc. # 71-3 at 106).

Importantly, although Plaintiff claims to have been diagnosed with depression and/or anxiety, the Rule 56 record does not contain any medical evidence confirming a formal diagnosis. There is Rule 56 evidence indicating that DiChiara[22] was aware that Plaintiff kept to himself, "prefer[red] to work alone," and was "unable to work with" certain coworkers and members of management. (Doc. # 71-4 at 52-53). Nevertheless, even when viewing the facts in the light most favorable to Plaintiff, the Rule 56 record is insufficient to support the inference

---

[21] Notably, "[t]he relevant inquiry in such cases is not the plaintiff's actual condition, but how the Defendant 'perceived [his] condition, including the reactions and perceptions of the persons interacting with or working with him.'" *E.E.O.C. v. American Tool & Mold, Inc.*, 21 F. Supp. 3d 1268, 1275 (M.D. Fla. 2014) (quotation omitted).

[22] Plaintiff argues that although DiChiara signed and issued Plaintiff's termination letter, DiChiara is not the only decisionmaker, as DiChiara "conferred" with Marlowe and Hamner regarding the "makeshift breakroom" situation. This argument holds no water. Plaintiff has not put forth any evidence establishing that Marlowe and/or Hamner made the decision to terminate Plaintiff (or even could have terminated him even if they wanted to). Rather, it was DiChiara and Lamb who terminated Plaintiff. (*See* Docs. # 71-20 at 4, ¶ 14; 71-5 at 2, ¶ 8; 76-8 at 12-13). Marlowe did not recommend Plaintiff's termination. (Doc. # 71-20 at 5, ¶ 20).

that DiChiara or Lamb, the decisionmakers, knew Plaintiff suffered from any mental impairment or perceived him to suffer from a mental impairment. And, although Lamb once suggested to Plaintiff that he talk to the EAP about counseling, anger management, or depression (Doc. # 71-25 at 2, ¶ 5), this is insufficient to establish that he perceived Plaintiff as suffering from a mental impairment. Plaintiff has failed to show that Defendant perceived him as having anything more than a temper, poor attitude, and an issue with authority.

Indeed, and this is crucial, Plaintiff did not inform any of his supervisors that he was experiencing any of the issues described above during his employment. (Doc. # 71-3 at 241). Although Plaintiff claims his depression interfered with his ability to interact with others to some degree, he also testified that when it came to his job, he continued to interact with people because he did not want anyone to "say that his job performance was poor." (Doc. # 71-3 at 240). There is no basis to conclude that employees without psychological training should know that Plaintiff's perceived poor attitude may have been the result of a mental impairment.

A case that highlights why Plaintiff's claim fails is *Mickens v. Polk County School Board*, 430 F. Supp. 2d 1265 (M.D. Fla. 2006). In *Mickens*, the plaintiff sued his employer for "employment discrimination on the basis of race and perceived mental disability." *Id.* at 1269. The plaintiff's "regarded as" claim under the ADA was submitted to the jury, which returned a verdict in favor of the plaintiff. *Id.* at 1273. The defendant then renewed its motion for judgment as a matter of law. *Id.* The plaintiff argued the following evidence showed that the defendant "regarded him as disabled":

> (1) [T]he [defendant's] request that [the plaintiff] receive counseling through an employee assistance program; (2) the [defendant's] request that [the plaintiff] undergo a psychological evaluation; (3) . . . testimony that [the plaintiff] became "really upset" on May 8, 1997, "was behaving irrationally," and was "very loud, and irate, and angry, and upset"; (4) [a] May 8, 1997[] letter

to [the plaintiff] recommending that [he] leave work for the afternoon due to his "insubordination and disrespectful behavior"; (5) [a] May 8, 1997[] letter to [another employee] requesting [the plaintiff's] reassignment for "failing to behave in a professional manner"; (6) . . . testimony describing [the plaintiff] as "combative," "confrontational," "defensive," "agitated," and "disrespectful"; (7) [a] August 7, 1997[] letter to [another employee] observing that [the plaintiff] "considers himself THE BOSS" and appears "angry and unhappy"; (8) [a] August 8, 1997[] memo to [another employee] describing [the plaintiff's] "threatening tone," revealing that "one teacher wondered how many personalities [the plaintiff] had," and concluding that [the plaintiff] "seemed not to have his act together" because "he did a lot of rambling"; and (9) [a] August 10, 1997[] letter to [another employee] noting that "[the plaintiff] is very unpredictable and difficult to work with. He goes from talking calmly to yelling without notice."

*Id.* at 1273-74. Notwithstanding these arguments, the court held that:

Neither any nor all of the evidence highlighted by [the plaintiff] provides a basis for a rational juror's finding that the [defendant] regarded [the plaintiff] as disabled by a mental impairment. Instead, the [defendant's] employees' characterizations of [the plaintiff] as "really upset," "insubordinate," "volatile," "disrespectful," "confrontational," "combative," "defensive," "agitated," "irrational," "loud," "irate," "angry," "unprofessional," "unhappy," "threatening," "unpredictable," and "difficult," including testimony as to [the plaintiff's] "uncharacteristic behavior" and his tendency to "fly off the handle," demonstrate (rather persuasively) [the plaintiff's] ongoing conflict with his supervisors and colleagues in the workplace. As a matter of law, "[s]uch conflicts do not rise to the level of a mental impairment under the ADA."

*Id.* at 1274.[23] *See also Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999)

(holding that "evidence [showing that] other [coworkers] regarded [the plaintiff] as 'paranoid,'

---

[23] The court recognizes that *Mickens* was decided before the enactment of the ADAAA, which broadened coverage of the ADA. However, that court's language would be just as applicable today. In fact, the court's language (that was penned even before passage of the ADAAA) is rather broad: "Neither any nor all of the evidence highlighted by [the plaintiff] provides a basis for a rational juror's finding that the [defendant] regarded [the plaintiff] as disabled by a mental impairment." *Mickens*, 430 F. Supp. 2d at 1274. To be sure, the court's analysis focuses on the conflict between the supervisor and the employee, which does not suggest a mental disability. The court's conclusion here is consistent with that court's analysis, notwithstanding the instruction of the ADAAA to construe "disability" broadly in favor of coverage.

'disgruntled,' 'oppositional,' 'difficult to interact with,' 'unusual,' 'suspicious,' 'threatening,' and 'distrustful[]' . . . merely show[ed] he had serious personality conflicts with members of his department," which "do not rise to the level of a mental impairment under the ADA").

One thing is readily apparent from the Rule 56 record: Plaintiff and DiChiara did not get along. But, conflict between a supervisor and a subordinate is insufficient to establish that DiChiara (or Lamb) perceived Plaintiff to suffer from a mental impairment. *See Mickens*, 430 F. Supp. 2d at 1274 ("[A]n employer's 'mere knowledge of behavior that could be associated with an impairment' fails to show that the employer regarded the employee as disabled.") (quoting *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998)).

Therefore, even if the court fully adheres to the ADAAA's directive that "disability" be broadly construed in favor of coverage, *see Jordan v. City of Union City, Ga.*, 94 F. Supp. 3d 1328, 1337 (N.D. Ga. 2015), Plaintiff has failed to establish the first prong of the *prima facie* test: that Defendant regarded him as suffering from a mental impairment.[24]

## 2.   Plaintiff Has Failed to Establish that He Was Discriminated Against Because of His Disability

A plaintiff satisfies the third prong of a *prima facie* case "by showing that he suffered an adverse employment action, such as termination, because of his disability." *Boyle v. City of Pell City*, 866 F.3d 1280, 1290 (11th Cir. 2017) (citing *Ellis v. England*, 432 F.3d 1321, 1326 (11th

---

[24] Moreover, even if Plaintiff had relied upon under the first definition of disability (*i.e.*, that he had "a physical or mental impairment that substantially limits one or more major life activities"), his *prima facie* case of disability discrimination would still fail. Plaintiff has failed to show that he suffered from a substantially limiting mental impairment *while employed by Defendant*. Plaintiff did not present any evidence showing that, while he was employed by Defendant, he had been diagnosed with either depression or anxiety, or that such diagnosis substantially limits one or more major life activities. Although Graves commented during one of Plaintiff's counseling sessions that Plaintiff was experiencing anxiety attacks, nowhere in the medical record does it suggest that Graves formally diagnosed Plaintiff with either depression and/or anxiety. (Doc. # 79-1 at 5). And, Plaintiff's own testimony that he was depressed is insufficient to establish that he suffered from a substantially limiting mental impairment. *See Morisky v. Broward Cty.*, 80 F.3d 445, 448 (11th Cir. 1996) ("Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA."); *Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 366 (3d Cir. 2008) (noting that "unsworn assertions that [the plaintiff] has various medical conditions" were not enough to prove that she had a physical or mental impairment).

Cir. 2005)). "It is not enough for a plaintiff to demonstrate that an adverse employment action was based partly on his disability. Rather, under the Rehabilitation Act, a plaintiff must prove that he suffered an adverse employment action 'solely by reason of' his handicap." *Ellis*, 432 F.3d at 1326 (citation omitted); *see Tarmas v. Sec'y of Navy*, 433 F. App'x 754, 761-62 (11th Cir. 2011). Moreover, "an employee cannot be fired 'because of' a disability unless the decisionmaker has *actual* knowledge of the disability." *Cordoba*, 419 F.3d at 1185.

Although Plaintiff's termination qualifies as an adverse employment action, he has failed to show that he was terminated "solely by reason of" his depression and anxiety. And this is particularly the case here where the Rule 56 evidence shows that DiChiara and Lamb, the decisionmakers, were unaware of any alleged disability. Although Plaintiff asserts that he informed Marlowe about his EAP counseling sessions for his depression (Doc. # 71-3 at 91-92), nothing in the Rule 56 record suggests that Marlowe informed DiChiara or Lamb about Plaintiff's counseling sessions, or that Marlowe was involved in the decision to terminate Plaintiff's employment (or recommended that he be terminated).

Plaintiff argues that, based on the way DiChiara treated him, the "mannerisms" Plaintiff exhibited, and the discipline actions that were taken between 2010 and 2015, it was impossible for DiChiara not to have known that Plaintiff suffered from depression. (Doc. # 71-3 at 95, 107). This argument holds no water. First, it may or may not be "fairly obvious . . . that Plaintiff had exhibited some behaviors which may be considered symptoms of depression or anxiety prior to being terminated." *Rogers*, 18 F. Supp. 2d at 1338 (citation omitted). But he has failed to point to any Rule 56 evidence that shows that his behaviors were "so *obviously* manifestations of an underlying disability that it would be reasonable to infer that his employer actually knew of the disability." *Rogers*, 18 F. Supp. 2d at 1338 (citation omitted). Second, the behaviors Plaintiff

claims to have suffered are just as easily explained by an understanding that they are motivated by someone who is not depressed or anxious, but rather by someone who is unfriendly or hostile. (Or shy or having a bad day). Indeed, it is likely that "[a]n employer would . . . never be held to have imputed knowledge of a depression or an anxiety disorder of its employee. Asking the employer to guess at such is asking too much of the employer, and of the ADA." *Rogers*, 18 F. Supp. 2d at 1337 (citation omitted). Finally, Plaintiff testified that he believed he was terminated, in part, because DiChiara was trying to keep Plaintiff from receiving tenure upon his ten-year anniversary with Defendant (Doc. # 71-3 at 112-14), and because DiChiara was retaliating against him for having complained about asbestos in 2010. (Doc. # 76-15 at 39). These reasons actually undercut Plaintiff's claim that Defendant terminated him *because of* a disability.

Ultimately, Plaintiff's arguments are just that: arguments—not facts. The Rule 56 *evidence* does not support the conclusion that Defendant perceived Plaintiff to have a disability when it made the decision to terminate his employment, or that it made the decision to terminate his employment "solely" because of that perceived disability.

Thus, Plaintiff has failed to establish a *prima facie* case of disability discrimination under Section 504 of the Rehabilitation Act.

### 3.  Defendant Has Offered Legitimate, Non-Discriminatory Reasons for Plaintiff's Termination

Even if Plaintiff had established a *prima facie* case of disability discrimination under Section 504 of the Rehabilitation Act (and, to be clear, he has not), Defendant has offered legitimate, non-discriminatory reasons for Plaintiff's disciplinary history and his ultimate termination. *Dale v. Wynne*, 497 F. Supp. 2d 1337, 1343 (M.D. Ala. 2007).

Similar to Title VII, the Rehabilitation Act "is not a shield against harsh treatment at the workplace. . . . The employer may fire an employee for a good reason, a bad reason, a reason

based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1325 n.16 (11th Cir. 1998).

Defendant says it terminated Plaintiff because (1) he was caught taking unauthorized breaks in a locked "makeshift breakroom" during the summer walk-through, and (2) he was on his final warning when video footage revealed that he was taking those breaks. (Doc. # 71-23 at 89). Defendant also terminated Ramsey and Cameron because they, too, were found to have taken unauthorized breaks. And, all three (including Plaintiff) initially lied to their supervisors about their knowledge of the room. (Doc. # 71-20 at 4, ¶ 14). These are legitimate, non-discriminatory reasons for terminating an employee. Defendant has satisfied its burden of production.

### 4.   Plaintiff Has Failed to Show that Defendant's Reasons are a Pretext for Unlawful Discrimination

Because "the employer satisfie[d] [its] burden of production, 'the presumption of discrimination is eliminated[,]' and the employee must come forward with evidence that would be sufficient to convince a reasonable fact-finder that the reason given by the employer is pretextual." *Dale*, 497 F. Supp. 2d at 1343 (quoting *Wascura v. South Miami*, 257 F.3d 1220, 1242 (11th Cir. 1999)). To demonstrate pretext, a plaintiff must show both (1) that the proffered reason was false, and (2) that discrimination was the real reason for the employer's action. *Brooks v. County Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006). Plaintiff has failed to do so.

Plaintiff argues that Defendant's reason for terminating his employment is false because he was not taking unauthorized breaks -- a conclusion reached by the Alabama Unemployment Board of Appeals (Doc. # 71-7 at 110) -- and because Lamb did not view the video footage. But, to establish pretext Plaintiff must do more than assert a conclusory argument; he must also

29

present evidence that his perceived disability was the real reason for his termination. *Brooks*, 446 F.3d at 1163. He has not done so.

First, the court is not bound by the findings of the Alabama Unemployment Board of Appeals. To be sure, the Supreme Court has held that "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *University of Tenn. v. Elliot*, 478 U.S. 788, 799 (1986) (citation omitted). However, "[t]he Eleventh Circuit has 'consistently recognized *Elliott*'s conclusion that Congress did not inten[d] *unreviewed* state administrative proceedings to have preclusive effect over Title VII [and ADA] claims.'" *Gatewood v. Unlimited Path, Inc.*, 2019 WL 920912, *2 (N.D. Fla. Jan. 17, 2019) (emphasis added) (quoting *Bishop v. City of Birmingham Policy Dep't*, 361 F.3d 607, 610 (11th Cir. 2004)). And, Plaintiff's alleged disability (or whether he was regarded as having a disability) does not appear to have been an issue before the Board, as the Rule 56 evidence is devoid of any mention of Plaintiff's disability during his unemployment benefits appeals hearing.

Second, Defendant terminated Plaintiff from employment for violating UA's policy on unauthorized breaks. Plaintiff has failed to put forth any Rule 56 evidence demonstrating that this reason is false and that discrimination because of an alleged disability was the real reason he was discharged. Plaintiff was on a final warning when he was seen -- on video -- entering and exiting, without authorization, a makeshift breakroom throughout the summer of 2015. There is simply no indication that Plaintiff was terminated because Defendant perceived him to have a disability. But, even if it could be said on this record that Defendant thought Plaintiff had a disability (and, to be clear, it cannot), "[t]he law is well settled that the ADA is not violated when

an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability." *Foley v. Morgan Stanley Smith Barney, LLC*, 2013 WL 795108, *8 (S.D. Fla. Mar. 4, 2013) (quotation omitted). To be sure, "the law does not require the [defendant] to ignore misconduct that has occurred because the [plaintiff] subsequently asserts it was the result of a disability." *Alvarez v. School Bd. of Broward Cty.*, 208 F. Supp. 3d 1281, 1286 (S.D. Fla. 2016) (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012)) (citation omitted).

Third, the Rule 56 evidence shows it is undisputed that Defendant had a good-faith belief that Plaintiff violated UA's policy on unauthorized breaks. So, even if Plaintiff did not violate a work rule or policy (and, to be sure, the uncontradicted Rule 56 evidence here indicates he did), "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Landry v. Lincare, Inc.*, 579 F. App'x 734, 738 (11th Cir. 2014) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999)).

Fourth, Plaintiff's argument that Defendant's reasons are pretextual because Lamb, one of the decisionmakers, did not view the video footage before making the decision to terminate Plaintiff is meritless. Both DiChiara and Lamb made the decision to terminate Plaintiff's employment. DiChiara reviewed the video footage (Doc. # 71-20 at 3, ¶ 11), and Lamb approved DiChiara's decision to terminate Plaintiff's employment. (Doc. # 71-25 at 2, ¶ 8). It was reasonable for Lamb to rely on DiChiara's investigation in making that decision.

Finally, with respect to Plaintiff's proffered "comparator evidence," Plaintiff has presented evidence that five employees (who are not disabled) associated with the makeshift breakroom were not terminated. But, none of these employees are appropriate comparators. In

the Eleventh Circuit, in order for a plaintiff to establish an appropriate comparator, he must show that the comparator (1) "engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) "[was] been subject to the same employment policy, guidelines, or rule as the plaintiff;" (3) "[was] ordinarily (although not invariably) . . . under the jurisdiction of the same supervisor as the plaintiff;" and (4) "share[d] the plaintiff's employment or disciplinary history." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1227-28 (11th Cir. 2019) (en banc).

Here, Thurman Griffin received a one-day suspension, and the four other employees received only written warnings. (Doc. # 71-10 at 27). But, with one exception, the Rule 56 record is devoid of any factual information as to what these other employees' disciplinary records were or whether they worked under the jurisdiction of the same supervisor as Plaintiff.

With respect to Tim Bolden -- an employee who visited the makeshift breakroom but who was not terminated -- Plaintiff argues that Bolden had an "extensive" disciplinary record for taking unauthorized breaks. However, that argument misses the mark. Plaintiff has failed to show that he and Bolden were under the jurisdiction of the same supervisor or shared the same employment history. Bolden may have had an extensive disciplinary history related to taking unauthorized breaks, but the Rule 56 record establishes that he had not received a final warning at the time the "makeshift breakroom" was discovered. (Doc. # 71-32 at 2, ¶ 4). And, Defendant has also said that Bolden was not terminated because he "was not seen in the video taking unauthorized breaks or entering the makeshift breakroom." (Doc. # 71-25 at 2, ¶ 8; Doc. # 71-32 at 2, ¶ 4).

Finally, Plaintiff's comparator arguments fail to acknowledge that two other non-disabled employees were also terminated for the same infraction: Ramsey and Cameron. And, Ramsey was terminated notwithstanding the fact that he only had one verbal counseling in over six years.

((Doc. # 71-20 at 4, ¶ 16). Therefore, Plaintiff has failed to show that he was terminated because of his disability and that the five other employees were not terminated because they do not have a disability.

Plaintiff has failed to show that his termination is related to a mental impairment or that Defendant "regarded him as" mentally impaired.   Plaintiff has also failed to show that Defendant's proffered reason for terminating Plaintiff was false, and that discrimination because of his depression and/or anxiety (or perceived depression and/or anxiety) was the real reason.

Consequently, Defendant is entitled to summary judgment on Plaintiff's disparate treatment claim under Section 504 of the Rehabilitation Act.

### B.      Plaintiff's Disparate Impact Claim Fails

In addition to his disparate treatment claim, Plaintiff also asserts a disparate impact claim. Plaintiff claims that Defendant "utilized an evaluation and disciplinary system which evaluated Plaintiff not on how he performed his duties but on his mental state and condition." (Doc. # 45 at 23, ¶ 83). Specifically, Plaintiff claims that "Defendant's evaluation and disciplinary system has a disparate impact on individuals, such as Plaintiff, who suffer from depression and anxiety solely because they manifest symptoms of that mental disability." (Doc. # 45 at 23, ¶ 85).

"[T]he central difference between disparate treatment and disparate impact claims is that disparate treatment requires a showing of discriminatory intent and disparate impact does not." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1278 (11th Cir. 2000) (citing *In re Emp't Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1310 n.8 (11th Cir. 1999)). "[T]he two theories are not interchangeable, and 'courts must be careful to distinguish between them.'" *E.E.O.C. v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1024 (11th Cir. 2016) (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003)) (alteration in original omitted). Disparate treatment

33

claims involve allegations that an employer "'treats some people less favorably than others because of their race, color, religion, sex, or [other protected characteristic].'" *Raytheon Co.*, 540 U.S. at 52 (quoting *Teamsters v. United States*, 431 U.S. 324, 335, n.15 (1977)) (alteration in original). "By contrast, disparate impact claims 'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *Id.* Discriminatory intent is not a necessary showing to establish a disparate impact claim. *Joe's Stone Crab*, 220 F.3d at 1273 (citation and footnote omitted). Rather, "[a] disparate impact claim requires the identification of a specific, facially-neutral, employment practice causally responsible for an identified statistical disparity." *Id.* at 1268.

It has been nearly fifty years since the Supreme Court recognized the theory of disparate impact, and it did so in a Title VII case. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) ("Under the act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."). But, this is not a Title VII case and so a penultimate question is whether Plaintiff can advance a disparate impact claim under section 504 of the Rehabilitation Act. He cannot.

### 1.     Plaintiff Cannot Advance a Disparate Impact Claim Under Section 504

Although the Eleventh Circuit has not specifically addressed the question, over twenty years ago it "assumed" that that a disparate impact claim is cognizable under Section 504 of the Rehabilitation Act. *Berg v. Fla. Dep't of Labor & Emp't Sec., Div. of Vocational Rehab.*, 163 F.3d 1251, 1254 (11th Cir. 1998). Nonetheless, Defendant urges the court to follow the Sixth Circuit's lead and similarly hold that "a disparate impact theory is not available under the

Rehabilitation Act." *Doe v. BlueCross BlueShield of Tenn. Inc.*, 926 F.3d 235, 242 (6th Cir. 2019).

In *Doe*, the court focused on the text of Section 504 in comparison to other antidiscrimination statutes. 926 F.3d at 242. It noted that Section 504's inherent purpose was to bar discrimination "*solely*" by reason of one's disability (that is, the employment policy must intentionally discriminate against an individual with a disability). *Id.* This purpose is materially different than prohibiting an individual being "otherwise adversely affected" by an employment policy. *Id.* "[W]hen the Court has found that a statute prohibits disparate-impact discrimination, it has relied on language like 'otherwise adversely affect' or 'otherwise make unavailable,' [] That language is missing from § 504, just as it is missing from Title VI." *Id.* The Sixth Circuit also scrutinized the similarities between the language of Section 504 and Title VI of the Civil Rights Act of 1964, after which it was patterned. *Id.* (citing *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 509 (1983)). After close examination of the texts, that court simply could not reconcile how Section 504 could provide a disparate impact claim when Title VI does not. *Id.* Therefore, that court reasoned, "[e]ven entertaining the idea of disparate-impact liability [under Section 504] invites fruitless challenges to legitimate, and utterly nondiscriminatory, distinctions" in employment policies." *Id.* In the end, the Sixth Circuit held that "[b]y any conventional measure, the text [of Section 504] leaves no room for the statute to prohibit disparate-impact discrimination." *Id.* at 243.

The court concludes the *Doe* analysis is persuasive. Although the Eleventh Circuit has yet to directly address this issue, the court predicts it would adopt the rationale in *Doe* and hold that a disparate impact claim is not cognizable under Section 504 of the Rehabilitation Act. Therefore, Plaintiff cannot proceed on a disparate impact claim under that statute.

### 2. In Any Event, Plaintiff Cannot Establish a Disparate Impact Claim

Even if the court were to conclude that a disparate impact claim is cognizable under Section 504, Plaintiff's disparate impact claim in this case would still fail. In order to succeed on a disparate impact claim, a plaintiff must show "that the defendant employed a facially neutral employment practice that had a significant discriminatory effect." *Stephen v. PGA Sheraton Resort, Ltd.*, 873 F.2d 276, 279 (11th Cir. 1989) (discussing a Title VII disparate impact claim). In order for a plaintiff to establish a *prima facie* case of disparate impact discrimination: (1) he "must identify the specific employment practice that allegedly has a disproportionate impact;" and (2) he must show causation through "statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination." *Pouyeh v. Bascom Palmer Eye Inst.*, 613 F. App'x 802, 810 (11th Cir. 2015) (discussing a Title VII disparate impact claim). Plaintiff has not made either showing.

"Typically, a disparate impact is demonstrated by statistics." *Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006); *see also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1217 (11th Cir. 2008) (explaining that "plaintiffs could have made a prima facie case of disparate impact by providing statistical evidence") (quotation omitted). To establish a significant statistical disparity, a plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question caused an adverse employment action to employees because of their membership in a protected group. *Joe's Stone Crab*, 220 F. 3d at 1274-75; *Summers v. Winter*, 303 F. App'x 716, 719 (11th Cir. 2008); *Krop v. Nicholson*, 506 F. Supp. 2d 1170, 1176 (M.D. Fla. 2007). "[I]t's not enough to show that a few people are affected by a policy—rather, the disparity must be substantial enough to raise an inference of [impact] causation." *Schaw v. Habitat for Humanity of Citrus Cty., Inc.*, 938 F.3d 1259, 1274 (11th Cir.

2019). "[Nor is it] enough to simply allege that there is a disparate impact on workers[] or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005). "Rather, the employee is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Id*. (internal quotation marks and citation omitted).

Here, Plaintiff has failed to establish a *prima facie* disparate-impact case. Plaintiff claims he "has identified an evaluation and disciplinary system [that] assessed *Plaintiff* not on how he performed his duties but on his mental state and condition." (Doc. # 77 at 32) (emphasis added). This assertion falls woefully short of identifying a specific employment practice that has a disproportionate impact on a protected *group*.[25] Plaintiff has failed to present evidence of any other employee with depression or anxiety who was also placed on a PIP. Similarly, he has not presented evidence of a disparity between those suffering from depression and/or anxiety and those who are not, as it relates to placement on a PIP. *See Schwarz*, 544 F.3d at 1218 (holding that a district court correctly rejected a disparate-impact claim because the plaintiff completely failed to present relevant comparative evidence). "The disparity of the evidence provided must be substantial enough to raise an inference of causation." *Smith v. Miami-Dade Cty.*, 621 F.

_____

[25] The bare-bones arguments advanced in Plaintiff's opposition brief fail to establish a disparate impact claim. The only "effect" of Defendant's evaluation and disciplinary system that Plaintiff challenges is the PIP he was issued in June 2013. The PIP employed the use of Defendant's "Core Competencies": (1) adaptability/flexibility, (2) collaboration/building relationships, (3) ethics/integrity, (4) conflict management, and (5) teamwork/cooperation. (Doc. # 71-11 at 36). These "competencies" are applicable "across the board" to all employees and are "a part of a competency dictionary that lists some specific behavioral indicators. It's a . . . [development] tool that … is helpful . . . in providing clear guidance to employees." (Doc. # 71-30 at 142-44). Plaintiff has failed to explain how use of these competencies, or the information contained in them, had a "disproportionate impact" on individuals suffering from depression and anxiety. Again, the PIP was revised to exclude these competencies "*as measurables*" because the campaign had not yet been rolled out with the accompanying employee training. However, the belief at that time was that those competencies were to be included in employee training shortly after the revision of the PIP (even though the campaign did not progress as intended). Therefore, the court concludes that, although Defendant kept the underlying concepts in the revised PIP, Plaintiff has not presented sufficient evidence suggesting that this decision was pretext for discrimination. Thus, Plaintiff has failed to present sufficient evidence suggesting that Defendant employed an evaluation system that discriminatorily impacts individuals with a disability.

App'x 955, 962 (11th Cir. 2015) (citation omitted). Plaintiff has failed to present any evidence raising such an inference.

And, even if he had pointed to a policy that affected a protected group (to be clear, he has not), he has not presented any statistical evidence demonstrating a discriminatory effect. *See Joe's Stone Crab*, 220 F.3d at 1274-75. That is, he has not shown that Defendant employed an evaluation and disciplinary system that has a disparate impact on individuals who suffered from depression and anxiety.

Plaintiff's proffered "statistical evidence" is completely detached from the Rule 56 facts in this case. Plaintiff's only "statistical evidence" is this:

> 21.9% of adults in Alabama have been diagnosed with depression. Approximately 1 in 5 Alabamians has been diagnosed with a depressive disorder. [Defendant] has thousands of employees serving approximately forty thousand students. Based on these statistics, hundreds of [University] employees are subject to discrimination, as Plaintiff was, as a result of . . . [Defendant's] core competency requirements.

(Doc. # 77 at 30). Plaintiff's argument presupposes that application of the core competency requirements has a discriminatory impact. But, he has presented no statistical *evidence* (and no other evidence, for that matter) showing that is the case.

Consequently, Defendant is entitled to summary judgment on Plaintiff's disparate impact disability discrimination claim.

## IV.    Conclusion

For all the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. # 69) is due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this June 12, 2020.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE